IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROSELIND QUAIR & CHAROLOTTE BERNA,
Petitioners,

v.

MIKE SISCO, ELMER THOMAS, KEVIN THOMAS, DENA BAGA, ELAINE JEFF, PATRICIAL DAVIS,and DOES 1 through 50, inclusive,

Respondents.

No. 1:02-CV-5891 DFL

Memorandum of Opinion and Order

This case arises from the decisions by the General Council of the Santa Rosa Rancheria Tachi Indian Tribe ("the Tribe") to banish and disenroll petitioners Roselind Quair and Charlotte Berna ("petitioners"). Petitioners contend that the banishment and disenrollment decisions violate the Indian Civil Rights Act ("ICRA") because petitioners were denied various procedural protections available in federal and state courts. The Tribal Business Committee members of the Santa Rosa Rancheria Tachi Indian Tribe ("respondents") take the position that ICRA does not override tribal sovereignty, which includes the right of the Tribe to follow its own traditional adjudicatory procedures in

banishment and disenrollment proceedings. Both petitioners and respondents now move for summary judgment. For the reasons below, the court DENIES petitioners' motion and GRANTS respondents' motion on petitioners' claims relating to disenrollment only.

I.

On October 2, 2000 the General Council of the Tribe banished and disenrolled Quair and Berna after they hired an attorney to sue the Tribe.[1] Quair's dispute arose out of her allegation that a male tribal member sexually harassed her. Berna's dispute had a more complex history. Berna had been the Treasurer of the Tribe and in that capacity had initiated disenrollment and banishment proceedings as against other members of the Tribe. After Berna was removed from her position as Treasurer, allegedly because of misuse of funds, she hired an attorney to regain her office. Both Quair and Berna, acting independently, hired the same attorney, a known opponent of the Tribe, who then made a shrill demand on the Tribe on behalf of both clients. The Tribe alleges that by hiring an attorney to sue the Tribe, Berna and Quair threatened tribal sovereignty and welfare.

In 2004, both parties moved for summary judgment. On July 26, 2004, Judge Robert E. Coyle, to whom this case was originally assigned, granted in part and denied in part both

[1] The General Council consists of all adult members of the Tribe.

motions.[2] Judge Coyle held that the court had habeas corpus jurisdiction under ICRA to review the Tribe's decision to banish Quair and Berna because: (1) banishment is criminal in nature; (2) banishment constitutes detention; and (3) petitioners had exhausted all available administrative remedies. Reviewing the merits of the case, Judge Coyle found disputes of material fact as to petitioners' due process and fair trial claims.[3] Quair, 359 F.Supp. 2d at 967, 971-72.

Following Judge Coyle's order, on September 3, 2004, respondents notified petitioners by certified mail that the General Council would hold a rehearing to reconsider the Tribe's earlier order of banishment and disenrollment. The letter advised petitioners that at this hearing petitioners would have the right to legal counsel and the right to present witnesses. The letter also indicated that respondent Elmer Thomas would testify and that petitioners would have the opportunity to cross-examine him. Petitioners refused to attend, contending that the rehearing still would violate ICRA because: "[the hearing] was in front of the same decision making body—the

---

[2] Judge Coyle's opinion sets out in depth most of the material facts relating to the case. See Quair v. Sisco, 359 F.Supp. 2d 948, 953-62 (E.D. Cal. 2004). Since that opinion, and in response to it, the General Council held a rehearing on October 1, 2004 to decide again whether to banish and disenroll petitioners. The facts relating to that rehearing are set forth below.

[3] Judge Coyle found that it was disputed whether: (1) petitioners received notice of the charge against them; (2) petitioners had notice that the General Council was considering banishment and disenrollment; and (3) petitioners had the right to confront hostile witnesses at the hearing. Quair, 359 F.Supp. 2d at 977-78.

General Council; the Tribe still lacked a formal judicial body and any formal procedures; and the October 1, 2004 General Council Meeting was a usurpation of the Federal Court's authority to determine what constituted sufficient process under the ICRA." (Pet'r. SUF 45.)

Despite the petitioners' absence, the General Council held the rehearing on October 1, 2004. Some of the participants at this hearing had attended and voted in the previous hearing. As before, the hearing did not follow any codified adjudicatory procedures. Moreover, the "customary" law that petitioners purportedly violated—the law against disturbing the stability and welfare of the Tribe—had not been reduced to writing in any code, statute book or similar document.

The General Council voted on four issues: (1) whether petitioner Berna should be banished; (2) whether petitioner Quair should be banished; (3) whether petitioner Berna should be disenrolled; and (4) whether petitioner Quair should be disenrolled.[4] After deciding to banish and disenroll both Berna and Quair, the General Council memorialized its decision in four resolutions, which the Bureau of Indian Affairs ("BIA") subsequently approved.[5]

---

[4] While Berna had not lived on the reservation since 1970, Quair lived on the reservation until she left one year after the Tribe decided to banish her. The Tribe had not taken any further steps to evict her.

[5] Resolution 2004-92 concludes: "NOW THEREFORE BE IT RESOLVED, based upon the foregoing decision of the General Council, Charlotte Berna is disenrolled from the Santa Rosa Rancheria Indian Community Tachi Tribe."

Resolution 2004-93 concludes: "NOW THEREFORE BE IT RESOLVED, based upon the foregoing decision of the General

II.

A. Respondents' Motion

1. Disenrollment

Respondents seek to distinguish banishment from disenrollment, arguing that the latter is not subject to federal habeas corpus review.[6]

ICRA guarantees to individual tribe members certain rights that are similar but not identical to those in the Bill of Rights and the Fourteenth Amendment. 25 U.S.C. §§ 1301-1303;

---

Council, Roselind Quair is disenrolled from the Santa Rosa Rancheria Indian Community Tachi Tribe."

Resolution 2004-94 concludes: ""NOW THEREFORE BE IT RESOLVED, based upon the foregoing decision of the General Council, Charlotte Berna is banished from the Santa Rosa Rancheria Indian Community Tachi Tribe."

Resolution 2004-95 concludes: "NOW THEREFORE BE IT RESOLVED, based upon the foregoing decision of the General Council, Roselind Quair is disenrolled from the Santa Rosa Rancheria Indian Community Tachi Tribe."

[6] Judge Coyle found that "disenrollment from tribal membership and subsequent banishment from the reservation constitute detention." Quair, 359 F.Supp. 2d at 971. But Judge Coyle's ruling does not govern the disenrollment of petitioners at the 2004 rehearing. Whether the court has habeas corpus jurisdiction to review the banishment and not the disenrollment of petitioners was not before Judge Coyle. In 2000, as opposed to after the rehearing in 2004, the General Council passed only one resolution sanctioning petitioners. That resolution ordered that petitioners be "immediately and permanently excluded" from the reservation and did not distinguish banishment from disenrollment. Because the disenrollment and banishment of petitioners were inseparable before the rehearing, Judge Coyle had no reason to consider whether the court had habeas corpus jurisdiction to review disenrollment separate from banishment.

Moreover, "[a] failure of subject matter jurisdiction is crucial and the lack of it may be raised at any time during the life of a lawsuit by either party or by the trial or appellate court on its own motion." 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1063 (2007).

Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 881-82 (2d Cir. 1996). In passing ICRA, Congress sought to achieve a delicate balance between protecting the rights of individual members and respecting tribal sovereignty. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 62 (1978). Therefore, Congress left enforcement of ICRA mostly to tribal courts. ICRA allows federal judicial review only by a petition of habeas corpus under § 1303 and otherwise does not permit private federal causes of action.[7] Id. at 70. Petitioners seeking relief under § 1303 must establish that: (1) the proceeding at issue is criminal and not civil in nature; (2) the Tribe is detaining them; and (3) they have exhausted all available tribal remedies. Quair, 359 F.Supp. 2d. at 963. This statutory framework tightly limits federal court review of tribal decisionmaking. In interpreting § 1303, courts should hesitate to so expand the meaning of "criminal" and "detention" such that, as a practical matter, all tribal decisions affecting individual members in important areas of their lives become subject to review in federal court. Such a result would be inconsistent with the principle of broad, unreviewable tribal sovereignty in all but criminal cases involving physical detention.

Tribal membership determinations are not exempt from habeas corpus review under § 1303 when the above three requirements are met. See Poodry, 85 F.3d at 901 (concluding that petitioners could challenge the tribe's decision to banish them and strip

[7] Section 1303 provides: "The privilege of the writ of habeas corpus shall be available to any persons, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303 (2006).

them of their membership in federal court after finding that § 1303's requirements were met). But courts long have recognized that the right to define its membership is central to a tribe's "existence as an independent political community." Santa Clara Pueblo, 436 U.S. at 72 n.32. Therefore, "the [federal] judiciary should not rush to create causes of action that would intrude on these delicate matters." Id. Because the Tribe's disenrollment of Quair and Berna directly addresses tribal membership, the court must exercise great caution in deciding whether § 1303 applies to these decisions by the Tribe.

Although the question is not free from doubt, the court finds that it lacks jurisdiction under § 1303 to review the Tribe's decision to disenroll petitioners from membership in the Tribe in the circumstances of this case. The Tribe's 2004 decisions to disenroll petitioners and to banish them were two distinct, independent sanctions. The General Council procedurally banished and disenrolled petitioners in separate actions at the rehearing, taking four separate votes and memorializing them in four separate resolutions. According to the Tribe's submission, it may banish without disenrolling and it may disenroll without banishing; the actions are not synonymous. It follows that the court may review the Tribe's disenrollment of Quair and Berna under § 1303 only if the disenrollments, considered separately from banishment, meet § 1303's three requirements.

Here, the disenrollment of petitioners does not qualify as detention under § 1303.[8] For the purposes of habeas corpus, a person is in detention or custody when severe restraints are imposed upon the person's liberty. Hensley v. Municipal Court, 411 U.S. 345, 351 (1973). Over the years, courts have expanded the scope of the term "custody" to cover "circumstances [that] fall outside conventional notions of physical custody." Edmunds v. Won Bae Chang, 509 F.2d 39, 40 (9th Cir. 1975); see also Hensley, 411 U.S. at 351 (extending habeas corpus relief to petitioner who was released on his own recognizance because the state could restrict his freedom at any time); Jones v. Cunningham, 371 U.S. 236, 242-43 (1963) (finding parolee entitled to habeas corpus relief because his liberty of movement was subject to various restraints imposed by the parole board). But no court has applied habeas corpus review in cases where the purported restraint does not limit the petitioner's geographic movement. For example, a person cannot invoke habeas corpus relief to challenge a fine. Moore v. Nelson, 270 F.3d 789, 791 (9th Cir. 2001) (finding that a petitioner cannot challenge an $18,000 fine levied by a tribe in federal court under § 1303); Edmunds, 509 F.2d at 41 (finding that petitioner could not invoke habeas corpus relief solely on the basis of a $25 fine). And while some courts have found that the denial of United States citizenship is subject to federal habeas corpus review,

---

[8] In contrast to other federal habeas statutes, such as 28 U.S.C. § 2254(a), § 1303 requires that petitioners be in "detention" instead of in "custody." But courts have found that § 1303 is no broader than analogous federal habeas statutes. See Poodry, 85 F.3d at 890.

the petitioners in those cases faced deportation upon losing their citizenship. See, e.g., Ng Fung Ho v. White, 259 U.S. 276, 284 (1922); Espino v. Wixon, 136 F.2d 96, 98 (9th Cir. 1943). Accordingly, the court may review the disenrollment of petitioners under § 1303 only if it similarly affects their geographic movement.

Whereas courts have held that banishment, including a stripping of tribal membership, constitutes detention, Poodry, 85 F.3d at 895-96, no court has held that disenrollment independently constitutes detention. And here, petitioners have failed to show that disenrollment, separate from banishment, restricts their physical freedom in any way.[9] While banishment requires a person – whether a member of the Tribe or not - to leave the reservation, disenrollment strips a member of tribal membership and the tangible tribal benefits that attend upon membership. 41 Am. Jur. 2d Indians; Native Americans § 17 (2006) ("Indian tribes have membership rolls for a variety of reasons, most notably for the distribution of assets and judgment funds in circumstances involving the distribution of tribal funds and other property under the supervision and control of the federal government.") In this case, all the benefits are financial, such as monthly per capita payments that

---

[9] Petitioners also fail to rebut the Tribe's contention that, in the past, members have been disenrolled without banishment and banished without disenrollment. As the proponents of jurisdiction, petitioners bear the burden on this issue.

come from the Tribe's gaming revenue.[10] According to respondents, nonmembers may live on the reservation, a point that petitioners do not dispute.

Although they bear the burden on jurisdiction, petitioners failed to address respondents' contention that disenrollment is distinct from banishment in their written opposition. At oral argument, petitioners contended that disenrollment was "worse" than banishment because it stripped them of valuable benefits and of their tribal identity. This misses the mark because the jurisdictional issue is whether the tribal action amounts to "detention," not whether it affects some other important interest. Section 1303 grants federal courts jurisdiction to review the "legality of [petitioner's] detention" and not penalties that, while harsh, do not constitute detention. Therefore, the court finds that § 1303 is simply inapplicable to the disenrollment of petitioners.[11]

---

[10] Other membership benefits include: LEAP payments, Elder benefits, health insurance, payment of burial expenses, semi-annual bonuses, educational support, post-high school scholarship programs, housing allotments, health care at the Tribal health center, and hiring preferences for tribal members for tribal employment.

[11] Closer to the mark is petitioners' contention, advanced at oral argument, that disenrolled individuals face a threat of eviction amounting to an infringement on physical freedom. Some courts have found that a person is in custody or detained when facing a threat of physical restraint, including deportation or eviction. But in those cases, the threat was imminent: the government had the authority to place the person immediately in jail without further decisionmaking. See Hensley, 411 U.S. at 351; Jones, 371 U.S. at 242. In contrast, petitioners here have made no showing that the General Council can remove nonmembers without taking another vote and making a new decision to remove the nonmember.

Petitioners have the burden of establishing the court's jurisdiction. Because petitioners have failed to show that disenrollment affects their physical freedom to a degree that it may be considered tantamount to detention, the court GRANTS respondents' motion for summary judgment as to petitioners' claims relating to disenrollment.

2. Banishment

While banishment constitutes detention, Quair, 359 F.Supp. 2d at 971, respondents argue in their motion that § 1303 is inapplicable to petitioners' banishment claims because the October 2004 rehearing mooted the entire case.

In the 2004 ruling, Judge Coyle refused to grant petitioners summary judgment on their claims alleging a denial of due process and denial of a fair trial because he found disputes of material fact as to: (1) whether petitioners received notice of the charge against them; (2) whether petitioners had notice that the General Council was considering banishment and disenrollment; and (3) whether petitioners had the right to confront hostile witnesses at the hearing. Quair, 359 F.Supp. 2d at 977-78. Because respondents offered petitioners these protections at the 2004 rehearing, they claim that this action is now moot.

Respondents are only partially correct. In his opinion, Judge Coyle did not find that petitioners were entitled to only these protections. Rather, Judge Coyle concluded that disputes of material fact as to these protections were enough for petitioners' claims to survive summary judgment. Judge Coyle

did not decide or address whether ICRA, and in particular the rights to due process and a fair trial under ICRA, guaranteed petitioners additional protections. Therefore, the rehearing mooted only disputes as to whether petitioners received notice and had the right to confront hostile witnesses, not the entire suit.[12]

B. Petitioners' Motion

Petitioners allege that respondents violated ICRA per se and that no balancing of the Tribe's and the individual member's interests is appropriate. Petitioners contend that the Ninth Circuit has overruled its decision in Randall v. Yakima Nation Tribal Court, 841 F.2d 897, 900 (9th Cir. 1988), and, therefore, that the balancing of interests analysis no longer applies. However, because the court finds that Randall has not been overruled, and because petitioners provide little analysis of the balance of interests, petitioners' motion will be denied.[13]

Under Randall and the cases following it, courts consider the tribal interest "in maintaining the traditional values of their unique government and cultural identity" when interpreting ICRA. Janis v. Wilson, 385 F.Supp. 1143, 1150 (D.S.D. 1974).

---

[12] Respondents also make the argument that the court lacks "the ability to create a judicial tribunal or to impose upon the Tribe rules and procedures which mirror the principals of American jurisprudence for the purpose of resolving intra-tribal disputes related to membership." Because it has yet to determine whether respondents violated ICRA, the court declines to speculate as to the remedies it may order.

[13] In view of the court's conclusion that it lacks jurisdiction to review the disenrollment of petitioners, the court addresses petitioners' motion for summary judgment only as to the claims relating to banishment.

While § 1302 incorporates certain amendments from the Bill of Rights, "the meaning and application of 25 U.S.C. § 1302 to Indian tribes must necessarily be somewhat different than the established Anglo-American legal meaning and application of the Bill of Rights on federal and state governments." Id. "Where the tribal court procedures under scrutiny differ significantly from those 'commonly employed in Anglo-Saxon society,' courts weigh 'the individual right to fair treatment' against 'the magnitude of the tribal interest [in employing those procedures]' to determine whether the procedures pass muster under the Act." Randall v. Yakima Nation Tribal Court, 841 F.2d 897, 900 (9th Cir. 1988) (citations omitted). But courts need not conduct this balancing test when "the tribal procedures parallel those found in 'Anglo-Saxon society.'" Id.

Here, the court must weigh petitioners' interests against the interests of the Tribe to determine the scope of petitioners' rights under ICRA. The Tribe's adjudicatory process is quite different from that followed in the common law, Anglo-American tradition. For example, the tribal adjudicatory body, the General Council, consisting of the entire membership of the Tribe, has combined executive, legislative, and judicial functions.

Petitioners make no argument based upon the Randall balancing test. Rather, petitioners argue that respondents violated ICRA per se because: (1) "the Tribe has absolutely no written standards or procedures governing disenrollment or banishment"; (2) the Tribe "fail[ed] to provide 'fair warning' of proscribed criminal conduct"; and (3) "the General Council is

not a fair and impartial tribunal." In making these per se arguments, petitioners make no showing that their individual interests in these procedural safeguards surpass any countervailing tribal interests.[14]

The premise of petitioners' per se contentions is that Randall is no longer good law in the Ninth Circuit. According to petitioners, the Ninth Circuit overruled Randall in Means v. Navajo Nation, 432 F.3d 924, 935 (9th Cir. 2005), and found a balancing of interests unnecessary because the protections in ICRA are identical to those found in the United States Constitution. Petitioners are incorrect. One panel of the Ninth Circuit lacks authority to overrule another panel. Moreover, in Means, the court likely concluded that a balancing of interests was unnecessary because of the particular circumstances in that case, most notably the critically important factor that, unlike the Tribe here, the tribe involved in the Means case, the Navajo Nation, uses an adjudicatory system resembling that of the Anglo-American tradition. For example, the Navajo Nation guarantees criminal defendants the right to a jury trial and the right to counsel. Navajo Nation Code tit. 1. Therefore, rather than overruling Randall, the Means court, followed Randall, foregoing the balancing test

[14] Cases cited by petitioners do not support finding per se violations. Petitioners cite many cases that interpret the United States Constitution but not as applied to Indian tribes under ICRA. They also cite to cases from other circuits in which the courts were not bound by Randall, as the court is here. Moreover, the tribes in the latter cases may use an adjudicatory process similar to that in the Anglo-American tradition, and, therefore, even under Randall, a balancing of interests would have been unnecessary.

because of the nature of the Navajo Nation's adjudicatory system.[15] Such an approach is not appropriate here as applied to a tribe with different traditions and customary procedures.

Moreover, petitioners allege that the resolutions banishing them are bills of attainder, and, therefore, violate ICRA. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977). While the General Council has executive, legislative, and judicial functions, petitioners argue that the General Council was acting as a legislative body when it banished them because it denied them all the protections of a judicial trial. But petitioners refer to protections common to Anglo-American judicial systems and which ICRA may not require of Indian tribes that follow a different model of adjudication. And here, the court has yet to decide what protections ICRA guarantees petitioners under Randall. By contending that the General Council is acting in its legislative capacity only because it failed to provide these

---

[15] Petitioners seize on the following statement in Means as overruling Randall: "the Indian Civil Rights Act confers all the criminal protections on Means that he would receive under the Federal Constitution, except for the right to grand jury indictment and the right to appointed counsel if he cannot afford an attorney." However, the court made this statement without any indication that it meant to limit Randall or fundamentally reinterpret Randall. Surely, if the Means court intended such a reinterpretation, it would have said so. See USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1294 (2d Cir. 1995) (noting the principle that, when courts intend to overrule clear precedent, they should do so in plain and explicit terms).

protections, petitioners simply recycle their due process arguments that they are per se entitled to these protections.[16]

III.

For the reasons above, the court DENIES petitioners' motion and GRANTS respondent's motion on petitioners' claims relating to their disenrollment.

IT IS SO ORDERED.

Dated: May 18, 2007

/s/ David F. Levi
DAVID F. LEVI
United States District Judge

[16] Petitioners also argue that banishment violates ICRA because it is cruel and unusual. Judge Coyle, however, found in his 2004 order that the banishment of petitioners was not cruel and unusual and already granted respondents partial summary judgment on this claim. Quair, 359 F.Supp. 2d at 978-79.